T.C. Memo. 2017-55

UNITED STATES TAX COURT

CAIPING ZANG AND TAO LIU, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 246-13.                          Filed April 3, 2017.

<u>Robert M. Kane, Jr.</u>, and <u>Sandra Veliz</u>, for petitioners.

<u>Melanie E. Senick</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  Respondent determined the following deficiencies in
and accuracy-related penalties with respect to petitioners' Federal income tax for
tax years 2006, 2007, and 2008 (tax years in issue):

- 2 -

**[*2]**

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2006 | $448,309 | $89,662 |
| 2007 | 311,021 | 62,204 |
| 2008 | 27,493 | 5,499 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

The issues for consideration are: (1) whether Tao Liu (petitioner husband) received and failed to report wage income of $7,350 for 2006; (2) whether Caiping Zang (petitioner wife) received and failed to report wage income of $11,395 and $42,354 for 2006 and 2007, respectively; (3) whether petitioners received and failed to report rental income of $11,072 and $24,190 for 2006 and 2007, respectively; (4) whether petitioners received and failed to report gambling winnings of $18,419 and $25,119 for 2006 and 2008, respectively; (5) whether the $1,274,091, $870,672, and $129,506 that petitioners received from Longyuan USA Seafood Co. (Longyuan) during the tax years in issue, respectively, were bona fide loans to petitioners or, instead, income that petitioners improperly failed

[*3] to report for the tax years in issue; and (6) whether petitioners are liable for section 6662(a) accuracy-related penalties for all tax years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners are a married couple who resided in the State of Washington when they timely filed the petition.

Background on Petitioners' Business

Longyuan and Qingdao

Petitioners moved from China to the United States in 2002. During the tax years in issue petitioners were employees of Longyuan, a business incorporated and with its principal place of business in the State of Washington. Forms 1120, U.S. Corporation Income Tax Return, filed for Longyuan (corporate tax returns) reported its primary business activity as the import and export of seafood products.

Longyuan was a wholly owned subsidiary of Qingdao Jiayuan Group Co., Ltd. (Qingdao), a Chinese company. Both petitioners had previously worked for Qingdao, and they moved to the United States at the direction of Qingdao's management to manage Longyuan. Petitioner husband's father was 96% owner of

[*4] Qingdao. Petitioners did not either individually or jointly own an interest in Longyuan or Qingdao.

Petitioners' Duties and Wages

Petitioner wife and petitioner husband served as Longyuan's sole officers during the tax years in issue. Petitioner wife was president and chief executive officer, and petitioner husband was vice president of the company. Petitioner wife's responsibilities included overseeing Longyuan's finances, including the writing of corporate checks and the filing of corporate tax returns, and maintaining the company's financial records. Petitioner husband oversaw the import of raw seafood products by Longyuan and was responsible for sales of finished products and maintaining relationships with customers. Longyuan also employed a bookkeeper during the tax years in issue who assisted petitioner wife in creating and maintaining QuickBooks records for the company.

Longyuan paid petitioners wages during the tax years in issue. Longyuan's corporate tax return for each of its fiscal years ending March 31, 2006, 2007, and 2008 (Longyuan's tax years 2005-07), reported compensation of $72,000 paid to petitioner wife and $60,000 paid to petitioner husband. Petitioners reported on their jointly filed Form 1040, U.S. Individual Income Tax Return (joint tax return), for each of the tax years in issue combined wage income of $132,000. On the

[*5] basis of Longyuan's canceled checks for payments made to petitioners during the tax years in issue respondent determined that Longyuan paid petitioner wife total wages of $83,395, $114,354, and $67,109, respectively, and paid petitioner husband total wages of $67,350, $35,571, and $55,929, respectively, during the tax years in issue.

### Longyuan's Financial Difficulties

Longyuan's business struggled financially during the tax years in issue. For each of Longyuan's tax years 2005-07, the company's expenses exceeded its gross receipts. Longyuan's corporate tax returns filed for its tax years 2005-07 reported net losses of $35,817, $91,824, and $264,247, respectively.

## Petitioners' Principal Residence and Rental Property

### Principal Residence

During the tax years in issue petitioners owned a property in Newcastle, Washington (Newcastle property), which was their principal residence.[1] On August 23, 2006, petitioner wife wrote a check from Longyuan payable to petitioner husband for $200,000, which petitioners used to refinance the Newcastle property.

---

[1]The Newcastle property is also referred to as being in Renton, Washington, on some of the exhibits.

**[*6]** <u>Rental Property</u>

On July 11, 2007, petitioners purchased a second property, in Bellevue, Washington (Bellevue property). Petitioners purchased the Bellevue property to become the offices of Longyuan. On June 6, 2007, petitioner wife wrote a check from Longyuan payable to petitioner husband for $160,000, which petitioners used for the downpayment to purchase the Bellevue property.

Petitioners leased the Bellevue property to Longyuan during the tax years in issue, and the property served as the company's offices and as a place to greet customers. For the tax years in issue petitioners reported on Schedules E, Supplemental Income and Loss, attached to their joint tax returns rents received of $21,000, $38,451, and $68,760, respectively. On the basis of Longyuan's canceled checks for payments made to petitioners during the tax years in issue respondent determined that Longyuan paid petitioners total rents of $32,072, $62,641, and $48,070 during the tax years in issue, respectively. On October 29, 2015, petitioners sold the Bellevue property and received proceeds of $164,894.

<u>Longyuan's and Petitioners' Banking Activity</u>

<u>Longyuan's Accounts</u>

Longyuan maintained several bank accounts during the tax years in issue: a U.S. Bank checking account, a Bank of America checking and savings account,

**[*7]** and a Wells Fargo checking account (corporate accounts). Cash in the corporate accounts was generally used to meet Longyuan's business expenses. Petitioner wife and petitioner husband were the only individuals with authorized access to Longyuan's corporate accounts and the only individuals authorized to issue checks from those accounts during the tax years in issue. According to petitioner wife, she usually recorded the issuance of corporate checks in QuickBooks registers that she maintained with the assistance of Longyuan's bookkeeper.

Payments From Longyuan to Petitioners

During the tax years in issue petitioners regularly issued themselves checks from Longyuan's corporate accounts for their wages and rent payments and to reimburse themselves for various business expenses. Petitioners also issued themselves numerous other checks drawn on the corporate accounts that were not for wages, rent, or reimbursement of business expenses. In most cases petitioner wife wrote and signed these other checks on behalf of Longyuan and made them payable to petitioner husband. Petitioners did not report the amounts that they received from these other checks as income on their joint tax returns for the tax years in issue.

**[*8]** Petitioners also made frequent cash withdrawals from Longyuan's corporate accounts during the tax years in issue. Petitioners made the cash withdrawals either in person at bank branches or, more frequently, at ATMs. Petitioners did not report the cash withdrawals from the corporate accounts as income for the tax years in issue.

Petitioners had no systematic way of recording these unreported check payments or the cash withdrawals from Longyuan's corporate accounts during the tax years in issue. On some of the checks that she issued from Longyuan, petitioner wife testified that she wrote the word "Loan" or a variation thereof in the checks' "memo" lines. However, on other checks petitioner wife left the "memo" lines blank.

By reviewing copies of Longyuan's canceled checks for the tax years in issue respondent determined that in addition to the checks that they received for their wages, rent, and reimbursement of business expenses, petitioners received checks from Longyuan for amounts totaling $653,168 and $616,085 during 2006 and 2007, respectively.[2] On the basis of detailed banking statements for Longyuan's corporate accounts for the tax years in issue respondent determined

[2]These amounts include the $200,000 check that petitioners used for the refinancing of the Newcastle property in 2006 and the $160,000 check that petitioners used for the down payment on the Bellevue property in 2007.

[*9] that petitioners' cash withdrawals from the corporate accounts totaled $620,923, $254,587, and $129,506 during the tax years in issue, respectively. Respondent determined that petitioners received total unreported payments from Longyuan's corporate accounts, that were not payments for wages, rent, or reimbursements, of $1,274,091, $870,672, and $129,506 during the tax years in issue, respectively. totaling $2,274,269.

According to petitioners, petitioner husband's father knew of the additional checks that petitioners issued themselves and the cash withdrawals that they made during the tax years in issue and petitioner husband's father "authorized" petitioners to withdraw these amounts for their personal use from Longyuan's corporate accounts. According to petitioners they used most of these checks and cash withdrawals for gambling at casinos.

Petitioners' Gambling Activity

Petitioners were prolific gamblers during the tax years in issue. Records kept by the Muckleshoot Indian Casino in Auburn, Washington, showed that both petitioners gambled there and won at least one "jackpot" on nearly every single day in 2006. For 2006 petitioners were issued more than 2,000 Forms W-2G, Certain Gambling Winnings.

[*10]  Petitioners reported on their joint tax returns for the tax years in issue gambling winnings of $7,795,492, $5,528,213, and $479,689, respectively.  On the basis of third-party information returns received by the Internal Revenue Service (IRS) respondent determined that petitioners received gambling winnings of $7,813,911, $5,525,850, and $504,808 during the tax years in issue, respectively.  For the tax years in issue petitioners' total gambling losses exceeded their total winnings.

On some occasions petitioner husband's father and executives or officers of Qingdao who were visiting the United States accompanied petitioners to the casinos.  According to petitioners they gave some of the money from the unreported additional check payments and cash withdrawals from Longyuan's corporate accounts to these individuals for them to use for gambling.

Preparation of Petitioners' and Longyuan's Tax Returns

For the tax years in issue a certified public accountant (C.P.A.) prepared Longyuan's corporate tax returns and petitioners' joint tax returns.  To aid in the preparation of Longyuan's corporate tax returns petitioners would meet with the C.P.A. and provide her with a QuickBooks register of checks that Longyuan had issued, as well as canceled checks, the company's banking statements, sales records, and information regarding inventory, accounts payable, and accounts

[*11] receivable.  Petitioners provided the C.P.A. with Forms W-2, Wage and Tax Statement, Forms 1098, Mortgage Interest Statement, and Forms W-2G to prepare their joint tax returns.

From reviewing Longyuan's banking statements the C.P.A. became aware of the substantial amounts that petitioners were withdrawing from the corporate accounts for their personal use.  When asked about the additional checks issued and the cash withdrawals made from the corporate accounts that were not for Longyuan's business expenses, petitioners represented to the C.P.A. that these withdrawals were loans from Longyuan to them.  Petitioners represented that petitioner husband's father authorized the loans.

The C.P.A. testified that the amounts petitioners took from Longyuan's corporate accounts during the tax years in issue were "too huge compared to the company's assets."  Given Longyuan's financial struggles, the C.P.A. was concerned that unless petitioners repaid the company it would have difficulty supporting itself and continuing its business operations.  When discussing petitioners' personal withdrawals from the corporate accounts with them during the tax years in issue, the C.P.A. encouraged petitioners to start making repayments to Longyuan.

[*12]  The C.P.A. was not convinced by petitioners' assertions that they, as officers of Longyuan, had the authority to advance themselves loans from the company.  The C.P.A. did not report the additional checks or the cash withdrawals that petitioners received for their personal use as an account receivable or other asset on Longyuan's corporate tax returns.  Instead the C.P.A. treated these amounts withdrawn from the corporate accounts as if the amounts had been paid to Longyuan's parent company, Qingdao, and then lent by Qingdao to petitioners.  These amounts that petitioners received were reflected ultimately on Longyuan's corporate tax returns as a reduction in the corporation's account payable to Qingdao.

Promissory Notes

Note Executed by Petitioners (Qingdao Note)

Petitioners did not individually or jointly execute any promissory notes payable to Longyuan during the tax years in issue to account for any of the checks or cash withdrawals that they received from Longyuan's corporate accounts.  On July 23, 2010, petitioners executed a note payable to Qingdao of $2,227,330 (Qingdao note), following the start of an IRS examination.

The Qingdao note does not provide for a repayment schedule and does not provide for the payment of interest.  The Qingdao note states that the principal

[*13] sum of the note is to be repaid by petitioners' sales of the Newcastle and Bellevue properties. The Qingdao note further states that "in the case of any unpaid balances * * * [petitioners] will have their wages retained by their employment." The Qingdao note is not secured by any of petitioners' personal property.

Between December 2010 and October 2014 petitioners wrote 11 personal checks payable to Longyuan and made three cash deposits into Longyuan's corporate accounts for varying amounts. Petitioner wife testified that petitioners wrote the personal checks and made the cash deposits "to pay the company back the loans." Petitioner wife also testified that on four occasions petitioners "returned" their normal salary and rent checks to Longyuan. Petitioner wife testified that the "returned" payments were also "to repay the company back for the loans."

After petitioners sold the Bellevue property in October 2015, they wrote three personal checks to Longyuan totaling $165,000, approximately their proceeds. Petitioner wife testified that these checks were "to pay back the company for the loan we borrowed." As of the time of trial petitioners still resided in the Newcastle property.

[*14]  Notes Previously Executed by Petitioner Husband's Father

Petitioner husband's father executed four notes in 2008 promising to repay amounts that he received from petitioner husband or that were withdrawn and advanced to him directly from Longyuan's corporate accounts.  Petitioner wife drafted these notes, and petitioner husband requested that his father sign them.  According to petitioner wife, she drafted notes on these occasions because she wished to keep a record of these transactions.  The notes reflected that petitioner husband's father received a total of $63,600.

On December 29, 2010, Qingdao made a wire transfer of $459,985 to Longyuan's corporate account at Wells Fargo.  According to petitioner wife, petitioner husband's father directed the wire transfer and the wire transfer was to repay funds that he borrowed from Longyuan during the tax years in issue.

Respondent's Examination and the Notice of Deficiency

Approximately in March 2010 respondent's agent began an examination of petitioners' 2006 joint tax return, which later expanded to include petitioners' joint tax returns for 2007 and 2008.  On March 26, 2010, respondent's agent issued a Form 4564, Information Document Request, requesting, among other things, documentation of any loans that petitioners obtained during the relevant period.  At the time of petitioners' first scheduled meeting with respondent's agent on

[*15] April 29, 2010, petitioners provided no promissory notes or other documents evidencing loan agreements between them and any other party.

Sometime between July and November of 2010 respondent's agent received a copy of the Qingdao note from petitioners. Respondent's agent requested additional documentation from petitioners showing how the amount of the Qingdao note had been calculated. Petitioners provided copies of Longyuan's canceled checks for payments made to petitioners for the tax years in issue. Petitioner wife testified that before providing the copies of Longyuan's canceled checks she altered an unspecified number of checks that had been issued to petitioner husband by handwriting the word "Loan" in the "memo" lines of the checks. Petitioner wife testified that she altered the checks "right before I gave * * * [them] to the IRS just so the IRS knows * * * [they are] for [a] loan."

Petitioners provided respondent's agent with QuickBooks registers purporting to summarize the checks issued from Longyuan to petitioners during the tax years in issue. According to petitioners these registers showed the check portions of the loans. Petitioner wife testified that she also altered the QuickBooks registers and entries for certain checks in the registers to identify entries as loans.

**[\*16]**                               OPINION

I.      Burden of Proof

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  In unreported income cases, however, the Commissioner bears the initial burden of producing at least minimal evidence linking the taxpayer with the tax-generating activity or the receipt of funds before the general presumption of correctness attaches to a determination.  Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985).  Once the Commissioner produces a minimal evidentiary foundation with respect to the items of unreported income, the burden of persuasion remains with the taxpayer to prove that he or she did not receive the alleged income or that the Commissioner's deficiency calculations were arbitrary or erroneous.  Id.  Respondent's determinations in the notice of deficiency are based on substantive evidence linking petitioners with the income at issue.

Respondent provided computer-generated IRPTRN transcripts and Wage and Income Transcripts (IRS transcripts) for petitioners for tax years 2006 and 2008.  The IRS transcripts reflect third-party information returns received by the IRS, including Forms W-2G, that reported gambling winnings paid to petitioners

[*17] for those years.  Petitioners have raised no reasonable dispute with respect to the accuracy of the information returns that are reflected on the IRS transcripts. See sec. 6201(d).

With respect to respondent's income adjustments for payments that petitioners received from Longyuan (including wages, rents, and the additional checks and cash withdrawals), petitioners failed to maintain adequate records of these payments for the tax years in issue.  See sec. 6001.  The records of specific payments that petitioners did provide were sparse, and petitioners testified that they created or altered many of these records in 2010 for the purpose of an IRS examination.  Respondent was therefore authorized to reconstruct petitioners' income by any method that "does clearly reflects income."  Sec. 446(b); Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989); sec. 1.446-1(b)(1), Income Tax Regs. The Commissioner's reconstruction of a taxpayer's income need only be reasonable in the light of all the surrounding facts and circumstances.  See Giddio v. Commissioner, 54 T.C. 1530, 1532-1533 (1970); Schroeder v. Commissioner, 40 T.C. 30, 33 (1963).  The specific-item method is an indirect method of income reconstruction that consists of evidence of specific amounts of income received by a taxpayer and not reported on the taxpayer's return.  See Estate of Beck v. Commissioner, 56 T.C. 297, 353-354, 361 (1971).

**[*18]** The stipulated exhibits included copies of Longyuan's canceled checks as well as copies of bank statements for Longyuan's corporate accounts for the tax years in issue. Respondent used these records to identify specific checks issued to and cash withdrawals made by petitioners from the corporate accounts. Each of the checks identified by respondent was made payable to either petitioner husband or petitioner wife, and petitioners testified that they were the only individuals authorized to make cash withdrawals from the corporate accounts during the tax years in issue. Respondent's specific-item method shows that petitioners withdrew substantial sums of money from Longyuan's corporate accounts that they did not report as income on their joint tax returns for the tax years in issue. The specific items respondent identified are prima facie evidence of income that petitioners received.

Respondent has carried the burden of production with respect to the unreported income adjustments, and the presumption of correctness may therefore attach to respondent's deficiency determinations. Petitioners bear the burden of establishing that the unreported items "should be excluded from income or allowed as deductions." Gemma v. Commissioner, 46 T.C. 821, 833 (1966).

Under section 7491(a)(1), the burden of proof may shift to the Commissioner if the taxpayer produces credible evidence with respect to any

**[\*19]** factual issue relevant to ascertaining the taxpayer's liability. See Higbee v. Commissioner, 116 T.C. 438, 442-443 (2001). Petitioners contend that the burden of proof as to whether the additional unreported check payments and cash withdrawals that they received from Longyuan were (or were not) bona fide loans should be shifted to respondent, because petitioners "complied with all reasonable requests for witnesses, information, documents, meetings, and interviews." We find that petitioners' evidence regarding the nature of these payments is not credible and does not justify shifting the burden of proof under section 7491(a)(1). The burden of proof on this issue remains with petitioners.

## II.    Gross Income

Section 61(a) defines gross income as "all income from whatever source derived". Gross income includes compensation for services, rent, and gambling winnings. See sec. 61(a)(1), (6); Campodonico v. United States, 222 F.2d 310, 314 (9th Cir. 1955). Gross income includes any funds that the taxpayer receives lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay. See James v. United States, 366 U.S. 213, 219 (1961). However, it does not include loans. Commissioner v. Tufts, 461 U.S. 300, 307 (1983).

**[*20]**  A.    Unreported Wages, Rents

Respondent used the specific-item method to determine that petitioner husband received unreported wages for 2006, that petitioner wife received unreported wages for 2006 and 2007, and that petitioners received unreported rents for 2006 and 2007.  From the copies of Longyuan's canceled checks for the tax years in issue respondent identified specific checks issued to petitioners that stated "salary" or "rent" in the checks' "memo" lines.

Petitioners did not provide their own computations of their wages and rents for 2006 and 2007 based on Longyuan's canceled checks.  Petitioners did not provide evidence showing that respondent's computations based on these records were arbitrary or erroneous.  Accordingly, we hold that petitioners have failed to meet their burden of proof, and we sustain respondent's determinations that petitioners received unreported wages and rents for 2006 and 2007.

B.    Gambling Winnings

The IRS transcripts substantiate respondent's determinations of petitioners' gambling winnings for 2006 and 2008.  Petitioners provided no evidence to contradict the amounts reflected on the IRS transcripts or to show that they did not receive those amounts.  We sustain respondent's determinations that petitioners received and failed to report gambling winnings for 2006 and 2008.

[*21]  C.     Purported Loans From Longyuan

Petitioners contend that the additional checks they received that were not for wages, rent, or reimbursements, and the cash withdrawals they made from Longyuan's corporate accounts during the tax years in issue were loans from the company and that those amounts should not be included in their gross income. The proceeds of a bona fide loan are not includible in gross income because the receipt of money is offset by a corresponding obligation to repay.  See Commissioner v. Tufts, 461 U.S. at 307.  For a bona fide loan to exist the parties to the transaction must have had an actual, good-faith intent to establish a debtor-creditor relationship at the time the funds were advanced.  Beaver v. Commissioner, 55 T.C. 85, 91 (1970).  An intent to establish a debtor-creditor relationship exists if the debtor intends to repay the loan and the creditor intends to enforce the repayment.  Id.; Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970).

Objective factors are considered to determine the parties' intent and whether a bona fide loan occurred, and no single factor is dispositive.  See Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), aff'g T.C. Memo. 1998-121; Frierdich v. Commissioner, 925 F.2d 180, 182 (7th Cir. 1991), aff'g T.C. Memo. 1989-393.  We examine the following factors to determine whether the additional checks and cash withdrawals that petitioners received were loans:

**[*22]**  (1) the ability of the borrower to repay;

(2) the existence or nonexistence of a debt instrument;

(3) security, interest, a fixed repayment debt, and a repayment schedule;

(4) how the parties' records and conduct reflect the transaction;

(5) whether the borrower has made repayments;

(6) whether the lender had demanded repayment;

(7) the likelihood that the loans were disguised compensation for services; and

(8) the testimony of the purported borrower and lender.

Welch v. Commissioner, 204 F.3d at 1230; see also Kaider v. Commissioner, T.C. Memo. 2011-174.

### 1.    The Ability of the Borrower To Repay

The parties' lack of any intent that the funds be repaid after they were advanced suggests that the parties did not intend a bona fide loan.  See Commissioner v. Makransky, 321 F.2d 598, 600 (3d Cir. 1963), aff'g 36 T.C. 446(1961).  Courts assess the ability to repay by whether there was "a reasonable expectation of repayment in light of the economic realities of the situation." Fisher v. Commissioner, 54 T.C. at 910.

[*23]  On their joint tax returns for the tax years in issue petitioners reported combined wage income of $132,000 each year and rental income of $21,000, $38,451, and $68,760, respectively.  Petitioners' gambling losses equaled or exceeded their gambling winnings for the tax years in issue.  Petitioners assert that they borrowed $1,274,091, $870,672, and $129,506 during the tax years in issue, respectively, a total of more than $2.2 million over that period.  Petitioners could not have reasonably expected to be able to repay those amounts on the basis of their regular sources of income.

Petitioners assert that their ability to repay was based predominantly on the equity in their personal residence and rental property, and the Qingdao note states that repayment is to be made from the sale of the Newcastle and Bellevue properties.  However, the suggestion that the sale of these properties would be enough to satisfy fully, or even a significant portion of, petitioners' purported obligation to Qingdao ignores the actual amount of debt that petitioners purportedly incurred.

When petitioners sold the Bellevue property in October 2015, they obtained proceeds of $165,000, which they testified they paid to Longyuan, presumably as payment on the Qingdao note.  This amount hardly exceeded the $160,000 that petitioners purportedly borrowed from Longyuan to purchase the Bellevue

**[*24]** property and represented less than 10% of the amount due on the Qingdao note. As of the time of trial petitioners still had not sold the Newcastle property. Petitioners provided no evidence that the proceeds that could be obtained from the future sale of the Newcastle property would be enough to significantly offset the unpaid amount of the Qingdao note, which by petitioners' own calculations currently exceeds $1.8 million.

### 2. Existence or Nonexistence of Debt Instrument

No contemporaneous promissory notes were drafted to memorialize the purported loans that petitioners received from Longyuan. Petitioners executed the Qingdao note in July 2010, 4-1/2 years after their first purported borrowing and after the start of the IRS examination of their joint tax returns for the tax years in issue. This lack of contemporaneous promissory notes weighs against petitioners' argument that the parties intended bona fide loans at the time that petitioners issued themselves the additional checks and made the cash withdrawals for their personal use from Longyuan's corporate accounts.

### 3. Security, Interest, a Fixed Repayment Debt, and a Repayment Schedule

Interest and a fixed schedule for repayment are characteristics of a true debtor-creditor relationship. See Frierdich v. Commissioner, 925 F.2d at 183-184;

[*25] Haag v. Commissioner, 88 T.C. 604, 616 (1987), aff'd, 855 F.2d 855 (8th Cir. 1988). The Qingdao note provides for no interest rate and no fixed schedule for repayment.

The Qingdao note identifies the proceeds of the sales of the Newcastle and Bellevue properties as the primary means of repayment, and petitioners assert that "the parties viewed this provision as a security interest in the properties." Regardless of how the parties "viewed" the provision concerning the sales of the Newcastle and Bellevue properties, petitioners provided no evidence of any legally enforceable security interests held by Qingdao or Longyuan in either of the properties. Even if we were to view the provision as creating a security interest in the proceeds of the sales of the properties, the evidence does not show that those proceeds would cover more than a small amount of the purported debt shown on the Qingdao note.

####    4.    How the Parties' Records and Conduct Reflect the Transaction

The parties' conduct and what few records they kept of the transactions suggest that there was no intent for Longyuan to make bona fide loans to petitioners when the funds were advanced. Petitioners have not established by any convincing evidence that they were authorized to lend themselves funds from Longyuan's corporate accounts for gambling or any other personal uses.

[*26] Petitioners testified that petitioner husband's father gave his authorization to petitioners to withdraw the unreported check and cash amounts from Longyuan's corporate accounts, but they presented no evidence corroborating their testimony. Petitioner husband's father did not testify at the trial. Petitioners and respondent presented conflicting evidence about how and when Qingdao's management became aware of the amounts that petitioners withdrew from Longyuan's corporate accounts.

Petitioners contend that the parties' failure to observe "formalities" such as promissory notes, interest rates, and fixed repayment schedules, is explained by "the relationship between father and son" as well as the parties' "ethnic Chinese culture", which they contend regards promissory notes "as unnecessary". However, petitioners insisted that petitioner husband's father execute promissory notes for amounts that he withdrew from Longyuan's corporate accounts in 2008. Petitioner wife testified that she drafted these documents in order to keep a formal record of the transactions "for bookkeeping purposes." This conduct, as well as other portions of petitioner wife's testimony, convince us that petitioners were cognizant of the need to observe certain formalities when sums were withdrawn from the corporate accounts, if for no other reason than "bookkeeping purposes."

[*27] Petitioners' contention that they were ignorant of the need for formalities in connection with their purported borrowing is undermined by the credible testimony of their C.P.A. The C.P.A. testified that "every time" she met with petitioners during the tax years in issue she expressed concern about the large amounts being withdrawn from Longyuan's corporate accounts and she advised petitioners to begin "taking care of it." The C.P.A. testified that she advised petitioners to "have a payment schedule * * * so * * * the company can still support itself". Petitioners repeatedly ignored the C.P.A.'s advice during the tax years in issue and ultimately took no action to "take care of" their purported debts to the company until after the start of the IRS examination.

The way the purported loans were reflected on Longyuan's corporate tax returns also evidences a lack of intent to establish a genuine debtor-creditor relationship with petitioners. The C.P.A. testified that she did not "feel comfortable" with petitioners' representations that they had the authority to lend themselves such large sums of money from Longyuan, a company to which petitioners owed a fiduciary duty as officers. The C.P.A. testified that Longyuan could not afford to extend loans of that magnitude during the tax years in issue. In order to avoid reporting the withdrawals as loans to petitioners, the C.P.A. reported petitioners' withdrawals as decreases in Longyuan's account payable to

[*28] Qingdao, which she testified was an attempt to "directly link * * * [petitioners] to the China company."

Petitioners' conduct following the start of the IRS examination suggests an effort to cover up their previous intent with respect to the amounts that they withdrew from the corporate accounts for gambling. Petitioner wife testified that she altered Longyuan's canceled checks and the company's QuickBooks records before providing them to respondent's agent "[b]ecause * * * [she] wanted to let them know * * * it's actually money we borrowed from the company." We conclude that petitioners' alterations of the business records were attempts to mislead rather than clarify. Similarly, petitioners' execution of the Qingdao note in July 2010 was a belated attempt to create documentary evidence of a debtor-creditor relationship where previously none existed.

5.    Whether the Borrower Has Made Repayment

Petitioners provided evidence of two cash deposits made into Longyuan's corporate account at U.S. Bank in April and May of 2006 for $6,000 and $1,000, respectively. Petitioner wife testified that she made these deposits and that they were to "pay back the loans we borrowed." These cash deposit slips are petitioners' only evidence of any payments that they made into Longyuan's corporate accounts during the tax years in issue.

[*29] Petitioners testified that they began making payments to Longyuan in December 2010 and that the payments were "to pay the company back for the loans." Payments that petitioners made starting in 2010 do not show that petitioners intended a bona fide debtor-creditor relationship to exist at the time that they received the unreported funds from Longyuan.

### 6.  Whether the Lender Had Demanded Repayment

Petitioners were the sole executive officers of Longyuan. On brief petitioners assert that petitioner husband had to discuss the matter of the purported loans with Qingdao's management and that Qingdao's management has requested information about petitioners' plans to repay. Requesting information about plans to repay is not a demand for repayment. Petitioners presented no evidence that Longyuan, Qingdao, or petitioner husband's father ever made demands on petitioners to repay any checks issued or cash withdrawals made from Longyuan's corporate accounts.

### 7.  The Likelihood That the Loans Were Disguised Compensation for Services

Petitioners received numerous checks from Longyuan for "salary" during the tax years in issue. Respondent does not assert that the additional unreported check payments and cash withdrawals that petitioners received were payments to

[*30] compensate petitioners for their services to the company. We do not conclude that the payments were disguised compensation for services.

### 8. The Testimony of the Purported Borrower and Lender

Petitioner wife and petitioner husband testified that when they issued themselves the additional checks and made the cash withdrawals from Longyuan for their personal use they intended to pay back the money to the company. Petitioners did not testify as to how and when they planned to make repayment. Petitioners testified generally that they had the authority to make the purported loans from Longyuan to themselves, but they also testified that frequently petitioner husband's father would not give his authorization until after the funds had already been withdrawn.

Petitioner husband's father did not testify on behalf of Qingdao. No other person familiar with Qingdao's business testified about whether petitioners had the authority to make loans to themselves from Longyuan for personal purposes or whether Qingdao intended to establish a debtor-creditor relationship with petitioners at the time that petitioners made the withdrawals from Longyuan's corporate accounts.

Petitioners testified that they wrote numerous checks and made numerous cash withdrawals from Longyuan's corporate accounts at the direction of

[*31] petitioner husband's father, who took the money for his own gambling. Petitioners contend that a significant portion of the unreported checks and cash withdrawals that respondent determined were income to them for the tax years in issue were actually loans to petitioner husband's father and not amounts received by them. Petitioners failed to corroborate their testimony to this effect with any convincing evidence. Petitioners' testimony was self-serving, and we need not and do not accept it. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Petitioners provided two QuickBooks spreadsheets, one purporting to summarize the checks and the other the cash withdrawals that they contend were loans to petitioner husband's father. However, each of the checks listed on the spreadsheet titled "[Petitioner Husband's Father's] Check Loan Report" was made payable to petitioner husband, and petitioner wife testified that she and petitioner husband were the only two individuals who could make cash withdrawals from the corporate accounts. Apart from their testimony, petitioners provided no evidence establishing that petitioner husband's father received the proceeds of the checks and cash withdrawals shown on the spreadsheets. Petitioner wife testified that she created the spreadsheets in 2010 after the start of the IRS examination. As with the other business records that petitioners altered following the start of the

[*32] examination, we have serious reservations about the credibility of the spreadsheets.

We reject petitioners' contentions that some portion of the unreported checks issued and cash withdrawals made from Longyuan's corporate accounts were loans to petitioner husband's father. The greater weight of the evidence supports our conclusion that petitioners received these amounts.

### 9. Conclusion

We conclude that petitioners did not in good faith intend to repay the purportedly borrowed amounts at the time that they received them, and neither Longyuan nor Qingdao intended to enforce repayment. Because there was no genuine intent at that time to establish a debtor-creditor relationship between the parties, we agree with respondent's determination that the additional checks issued and the cash withdrawals made from Longyuan's corporate accounts during the tax years in issue were not bona fide loans to petitioners and should be included in income.

## III. Accuracy-Related Penalties

Respondent determined that for each tax year in issue petitioners are liable for an accuracy-related penalty pursuant to section 6662(a). Under section 7491(c) the Commissioner bears the burden of production with regard to penalties

**[*33]** and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty.  See Higbee v. Commissioner, 116 T.C. at 446.  However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalty is inappropriate.  Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

Section 6662(a) imposes a 20% penalty on any portion of an underpayment of tax attributable to, among other things, negligence or disregard of rules or regulations within the meaning of subsection (b)(1), or any substantial understatement of income tax within the meaning of subsection (b)(2).  Respondent asserts both that petitioners had underpayments due to substantial understatements of income tax and that they were negligent in their underpayments for the tax years in issue.  Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b).  Sec. 1.6662-2(c), Income Tax Regs.

An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return, less any rebate.  Sec. 6662(d)(2)(A).  An understatement of income tax is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec.

**[*34]** 6662(d)(1)(A). Respondent has met the initial burden of production because our conclusions as to the deficiencies result in the following substantial understatements of income tax:

| Year | 10% Of tax required to be shown | Understatement |
|------|------|------|
| 2006 | $47,094 | $448,309 |
| 2007 | 33,434 | 311,021 |
| 2008 | 4,546 | 27,493 |

The burden is on petitioners to prove that the penalties are inappropriate.

The section 6662(a) penalty does not apply with respect to any portion of the underpayment for which it is shown that the taxpayer had reasonable cause and acted in good faith. Sec. 6664(c)(1). A taxpayer may establish reasonable cause and good faith by showing reliance on professional advice. Sec. 1.6664-4(b)(1), Income Tax Regs. Petitioners contend that they relied on the advice of their C.P.A. To establish good faith and reasonable cause through reliance on professional advice, a taxpayer must prove by a preponderance of the evidence that (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's

[*35] judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioners informed the C.P.A. that the large sums that they withdrew from Longyuan's corporate accounts for their personal use during the tax years in issue were loans and that they intended to repay these loans.  On the basis of information from petitioners the C.P.A. did not report the sums as income on petitioners' joint tax returns. We concluded that petitioners did not intend to establish a bona fide debtor-creditor relationship.  Petitioners were not forthcoming with the C.P.A. about their intentions with respect to the additional checks and the cash withdrawals that they received.  They failed to provide the C.P.A. with necessary and accurate information that she needed to properly assess their Federal income tax liability.

The C.P.A. advised petitioners on multiple occasions that they needed to establish a repayment schedule and start making repayments to Longyuan for the amounts that they purportedly borrowed.  The record shows that petitioners ignored the C.P.A.'s advice until the IRS started an examination of their joint tax returns.  Petitioners did not act with reasonable cause and in good faith for the portions of the underpayments attributable to the purported loans.

[*36]  Petitioners have not shown that they provided all necessary and accurate information to the C.P.A. regarding their wages and rental income from Longyuan or their gambling winnings for the tax years in issue.  Petitioners failed to establish that they acted with reasonable cause and in good faith for the portions of the underpayments attributable to those items.

Petitioners are liable for the accuracy-related penalties determined by respondent under section 6662(a).  Because petitioners are liable for the penalties on the basis of substantial understatements, we need not address whether petitioners were negligent in their failure to report the purported loans and other amounts as income for the tax years in issue.

Any contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.