T.C. Memo. 2020-130

UNITED STATES TAX COURT

ROBERT J. BELANGER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25306-14.                     Filed September 10, 2020.

William J. Lovett, for petitioner.

Patrick F. Gallagher, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, Judge: By statutory notice of deficiency dated July 2, 2014,

respondent determined deficiencies in petitioner's Federal income tax and civil

[*2] fraud penalties pursuant to section 6663(a)[1] for the 1999 and 2000 taxable years (years at issue) as follows:

| Year | Deficiency | Penalty sec. 6663(a) |
|------|------------|----------------------|
| 1999 | $129,668 | $97,251 |
| 2000 | 61,499 | 46,124 |

The issues for decision for the years at issue are: (1) whether respondent timely mailed a notice of deficiency to petitioner, (2) whether petitioner had additional income from Number One Foundations, a business he reported on his 1999 and 2000 Federal income tax returns as a sole proprietorship, and (3) whether petitioner is liable for civil fraud penalties. We resolve these issues in respondent's favor.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in Massachusetts when his petition was timely filed with the Court.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar.

**[*3]** I.     Petitioner and His Business Endeavors

Petitioner was born in 1945 in Quebec, Canada, and spoke only French when he moved to Massachusetts as a child.  He learned English around age 10 or 11 while attending elementary school in Massachusetts.  He never graduated from high school, having left high school after the 10th grade.  However, he went to a trade school and took up carpentry.

During the 1970s or 1980s petitioner founded Number One Foundations, a construction company that primarily installed concrete foundations.  Since its founding and through at least the years at issue Number One Foundations was petitioner's unincorporated business.  During the years at issue petitioner was also the sole shareholder of Capital Leasing of Cape Cod, Inc. (Capital Leasing), an S corporation.[2]  Capital Leasing was in the business of leasing trucks and vehicles and selling materials and supplies to others who also did foundation installation work.  At all relevant times, the business addresses of Number One Foundations and Capital Leasing, as well as the telephone number of Number One Foundations, were the same as petitioner's home address and telephone number in Centerville, Massachusetts.

---

[2]Petitioner incorporated Capital Leasing on January 8, 1997.

**[*4]**  During the years at issue petitioner spent approximately six to seven days per week, 10 to 12 hours per day, on work related to Number One Foundations. He ran the footing crew, which included loading and unloading planks, setting them up, and pouring concrete. He also handled job proposals and customer invoices, including mailing and tracking the invoices and receiving customers' payments.

In 1985 or 1986 petitioner's son Steven, who also lived in Centerville, Massachusetts, began working for him in connection with Number One Foundations. With the goal of someday taking over the business, over time Steven assumed responsibility for some of the operational aspects of Number One Foundations.[3] By 1999 Steven had opened two business bank accounts, over which he had sole signature authority, for Number One Foundations at Cape Cod Five Cents Savings Bank (Cape Cod Five).[4] During the years at issue he maintained those accounts and was responsible for paying Number One Foundation's expenses, including its payroll. He maintained business insurance for Number One Foundations under his name. He was also responsible for driving

_____

[3]At a time after the years at issue not established by the record, Steven purchased Number One Foundations from petitioner.

[4]During the years at issue petitioner also had a personal checking account with Cape Cod Five.

**[\*5]** a truck, dispatching foundation panels, and ordering materials. During the years at issue Number One Foundations paid Steven a weekly salary of $600-$800.

Unlike for Capital Leasing, petitioner did not use QuickBooks or other accounting software to maintain Number One Foundations' books and records; instead, petitioner adopted the following recordkeeping system that involved using the stairs inside his house: (1) he placed job proposals on the first or bottom step; (2) once a job proposal was accepted by a customer, he placed the work order for the job on the next higher step; (3) once the job was completed and an invoice was sent requesting payment he placed the work order for that job on the next higher step; and (4) once payment was received he stamped the work order "PAID" and placed the order in a box. When it was time to prepare his 1999 return, petitioner's girlfriend, Julie Charapezza, took the box with the 1999 paid work orders, added up the 1999 payments to arrive at Number One Foundations' gross receipts for 1999, and then provided that total gross receipts figure to him. When it was time to prepare his 2000 return, petitioner had Nancy Lucean add up the 2000 payments as reflected on the 2000 paid work orders to arrive at Number One Foundations' gross receipts for 2000, and then she provided that total gross

[*6] receipts figure to him.[5]  Number One Foundations' gross receipts were $1,220,154 and $1,477,905 for 1999 and 2000, respectively.

During the years at issue Number One Foundations' customers routinely paid by check, and these checks were made payable to Number One Foundations, petitioner, or Steven[6] and received by petitioner at his Centerville, Massachusetts, home.  Petitioner instructed Steven weekly as to what to do with customers' checks; he instructed Steven to go to Cape Cod Five (and other banks) to (1) cash customers' checks and bring the cash back to him, (2) negotiate the checks for treasurer's checks payable to him or Steven,[7] and/or (3) deposit a portion of the

---

[5]Ms. Charapezza died in December 2000.

[6]Specifically, the checks in the record indicate "Robert Belanger", "Bob Belanger", "Robert Belanger No. 1 Foundations", "Robert Belanger d/b/a No. 1 Foundations", "No. One Foundations Robert Belanger", "Belanger Foundations", "Steven Belanger", "Steve Belanger", "Steve Belanger & #1 Foundations", "Number 1 Foundations Steve Belanger", "Steve Belanger DBA No. 1 Foundations", "No. 1 Foundations Stephen Belanger", "No 1 Foundations Steven Belanger", "#1 Foundations Stephen Belanger", "Number One Foundations", "No. One Foundations", "# 1 Foundations", "#1 Foundation Co.", "Foundations No. 1", "A1 Foundation", "A 1 Forms", "No. 1 Forms", or "No. 1 Foundations" as the payee.

[7]The record includes numerous Cape Cod Five checks each titled "Treasurer's Check" although at trial a testifying witness (and petitioner's posttrial opening brief) sometimes referred to these checks as cashier's checks.  A treasurer's check is a check issued by a bank's officer on the bank's own account; it is synonymous with a cashier's check.  See Nasdaq, Treasurer's check,

(continued...)

[*7] checks and receive the remainder in cash and/or treasurer's checks. When Steven got a treasurer's check (and he got multiple treasurer's checks on the same day on several occasions), no single check was for an amount greater than $10,000 although in the aggregate the checks may have totaled more than $10,000. In 1999 Steven negotiated customers' checks for 30 treasurer's checks from Cape Cod Five, 19 checks payable to petitioner totaling $105,489 and 11 checks payable to himself totaling $38,500. In 2000 he negotiated customers' checks for 21 treasurer's checks from Cape Cod Five, 4 checks payable to petitioner totaling $20,565 and 17 checks payable to himself[8] totaling $83,700.[9] Petitioner also on occasion negotiated customers' checks for treasurer's checks from various banks. With some of the cash, Number One Foundations' undocumented laborers were

---

[7](...continued)
https://www.nasdaq.com/glossary/t/treasurer-check (last visited July 7, 2020). For uniformity we refer to these types of checks as treasurer's checks throughout the opinion.

[8]One of the 17 checks payable to Steven is payable to Steven and Rita Brown. The record does not reflect who Ms. Brown is.

[9]In 1998 Steven negotiated customers' checks for 32 treasurer's checks, 27 checks payable to petitioner, 4 checks payable to Steven, and 1 check payable to Steven's wife. As discussed infra p. 12, many of the 1998 treasurer's checks payable to petitioner needed to be reissued.

[*8] paid wages "under the table", and consequently, no Federal employment taxes were withheld and paid on these wages.[10]

## II.    Tax Reporting of Number One Foundations

Petitioner prepared and filed his Federal income tax returns for the years at issue with the assistance of Nicholas Allen, a self-employed certified public accountant.[11]  In preparing returns Mr. Allen would typically receive income and expense information from his clients, including Forms W-2, Wage and Tax Statement, Forms 1098, Mortgage Interest Statement, and Forms 1099-MISC, Miscellaneous Income, and prepare worksheets summarizing the information provided.  Additionally, he would maintain a file for each client containing copies of whatever information he was provided, together with a copy of the filed return. For 1999 petitioner provided Mr. Allen with handwritten ledger sheets that listed in pertinent part "Total Income" of $86,544 ("Totals for Year" of $126,767, "Less

---

[10]We use the term "Federal employment taxes" throughout this opinion to refer to the taxes imposed under the Federal Insurance Contributions Act, secs. 3101-3128, and the Federal Unemployment Tax Act, secs. 3301-3311, and Federal income tax withholding, secs. 3401-3406.  During the years at issue petitioner paid wages "under the table" to Number One Foundations' undocumented laborers totaling approximately $3,000 weekly.

[11]Petitioner also prepared and filed with Mr. Allen's assistance the 1999 and 2000 Federal income tax returns, i.e., Forms 1120-S, U.S. Income Tax Return for an S Corporation, of Capital Leasing.

[*9] Int Income" of $223 and "Less[] Personal Deposits" of $40,000).  For 2000 petitioner provided Mr. Allen with a handwritten worksheet that listed in pertinent part "Deposits Income" of $90,606 and "1099's" of $111,431.  Petitioner did not provide Mr. Allen with any supporting documentation, such as Forms 1099, receipts, invoices, or bank statements, although three of Number One Foundations' customers issued 2000 Forms 1099-MISC showing payments to Number One Foundations totaling $111,431.[12]

Steven also prepared and filed his 1999 and 2000 Federal income tax returns with Mr. Allen's assistance, and he, like petitioner, provided Mr. Allen with only handwritten ledger sheets or worksheets of his income and expenses for the years at issue, which Mr. Allen in turn used to create handwritten spreadsheets to help him prepare these returns.[13]  Mr. Allen's spreadsheets listed in pertinent part income attributable to Number One Foundations of $800,327 ("Form 1099"

---

[12]One 2000 Form 1099-MISC showed a payment of $96,776 with the recipient name "Robert Belanger No. 1 Foundations" and Steven's taxpayer identification number (TIN).  A second 2000 Form 1099-MISC showed a payment of $2,520 with the recipient name "Bob Belanga" and petitioner's TIN.  A third 2000 Form 1099-MISC showed a payment of $12,135 with the recipient name "Bob Belanger" and petitioner's TIN.

[13]Mr. Allen did not create similar handwritten spreadsheets for petitioner for the years at issue because the information he received from petitioner was less than what Steven provided and thus he could easily use petitioner's information to prepare petitioner's returns for the years at issue.

[*10] income of $583,327 and "Cash" of $217,000) for 1999, and income attributable to Number One Foundations of $1,199,896 ("Form 1099" income of $736,896 and "Cash" of $463,000) for 2000. Neither Steven nor petitioner informed Mr. Allen that he had negotiated customers' checks for treasurer's checks payable to him during the years at issue.

Although Number One Foundations was petitioner's unincorporated business, he and Steven each attached to their respective returns for the years at issue Schedules C, Profit or Loss From Business, for Number One Foundations. Additionally, petitioner's Schedules C for Number One Foundations for the years at issue indicated an employer identification number (EIN) ending in 1742, while Steven's Schedules C for Number One Foundations for the years at issue indicated an EIN ending in 7445.

On his 1999 Schedule C for Number One Foundations, petitioner reported gross receipts of $86,544, cost of goods sold of $4,126, and total expenses of $13,016 (consisting of $6,292 for car and truck expenses, $200 for legal and professional services, $556 for office expenses, $2,797 for utilities, and $3,171 for other expenses, which consisted of $2,865 for telephone and $306 for work clothes). On his 1999 Schedule C for Number One Foundations, Steven reported gross receipts of $800,327, cost of goods sold of $348,750, and total expenses of

- 11 -

**[\*11]** $337,751 (consisting of $32,869 for car and truck expenses, $26,531 for depreciation and section 179 expenses, $31,051 for insurance, $1,706 for interest other than mortgage interest, $3,000 for pension and profit-sharing plans, $42,512 for supplies, $17,185 for taxes and licenses, $165 for meals and entertainment, $1,659 for utilities, $171,286 for wages, and $9,787 for other expenses, which consisted of $4,895 for telephone, $1,513 for payroll services, $844 for medical expenses, and $2,535 for "other").  On his 2000 Schedule C for Number One Foundations, petitioner reported gross receipts of $111,431, cost of goods sold of $12,165, and total expenses of $33,888 (consisting of $17,190 for advertising, $225 for legal and professional services, $4,658 for office expenses, $2,500 for meals and entertainment, $2,679 for utilities, and $6,636 for other expenses, which consisted of $5,086 for telephone, $500 for work clothes, and $1,050 for fees).  On his 2000 Schedule C for Number One Foundations, Steven reported gross receipts of $1,199,896, cost of goods sold of $428,715, and total expenses of $502,269 (consisting of $25,531 for car and truck expenses, $35,077 for depreciation and section 179 expenses, $20,374 for insurance, $3,415 for mortgage interest, $3,000 for pension and profit-sharing plans, $126,877 for rent or lease of vehicles, machinery, and equipment, $13,071 for repairs and maintenance, $70,439 for supplies, $17,715 for taxes and licenses, $319 for utilities, $179,260 for wages,

[*12] and $7,191 for other expenses, which consisted of $3,618 for telephone, $1,487 for payroll services, $1,152 for medical expenses, and $934 for "other").

III.    Criminal Tax Investigation and Proceedings

In November 2000 Jane Burlingame, the assistant branch manager of Cape Cod Five's Centerville, Massachusetts, location, contacted petitioner to inform him that numerous treasurer's checks payable to him needed to be reissued because otherwise the bank would consider the checks abandoned property. During her conversation with petitioner, Ms. Burlingame asked whether he would like her to issue one or two treasurer's checks or open an interest-bearing money market account or certificate of deposit in his name rather than reissuing treasurer's checks payable to him in the same amounts. Petitioner declined her suggestions and told her that he would send Ms. Charapezza to the bank with the treasurer's checks that needed to be reissued.

Ms. Charapezza brought 21 treasurer's checks totaling $120,903, all originally negotiated by Steven in 1998, to Cape Cod Five for Ms. Burlingame to reissue. After Ms. Burlingame reissued the treasurer's checks, Cape Cod Five's security officer, Diane Rowlings, became aware of the transactions. After conducting an investigation, on or around January 16, 2001, she filed a Suspicious Activity Report (SAR) with respect to the transactions with the U.S. Department

[*13] of the Treasury's Financial Crimes Enforcement Network (also known as FinCEN).[14] Internal Revenue Service (IRS) Special Agent Renee Iantosca (Special Agent Iantosca) ultimately received and reviewed the information reflected in the SAR.[15] On the basis of this information Special Agent Iantosca contacted petitioner by phone to arrange to meet with him in person to do an anti-money-laundering compliance check.[16]

On March 27, 2001, Special Agent Iantosca (along with IRS Special Agent Edward Jay (Special Agent Jay)) briefly met with petitioner outside his Centerville, Massachusetts, home. Special Agent Iantosca reminded him that they were meeting to question him regarding the treasurer's checks payable to him that remained outstanding. He told them that he (and Ms. Charapezza) had purchased the treasurer's checks over the years with cash and that he was using them as

---

[14]The SAR also indicated that as of January 16, 2001, there were 22 additional treasurer's checks payable to petitioner totaling $115,854 still outstanding. Accordingly, the SAR indicated that the "Violation Amount" was $236,757.

[15]Various documents in the record also refer to Special Agent Iantosca as IRS Special Agent Renee Flood.

[16]This check generally involves having a business or an individual explain the reasons for engaging in a financial transaction that, for example, appears structured to avoid the filing of a Currency Transaction Report (CTR), which banks file when a transaction involves an exchange of cash or currency greater than $10,000.

[*14] savings.  In response to Special Agent Jay's asking him why he did not deposit the moneys into his Cape Cod Five personal checking account so that he could at least earn some interest, petitioner stated that it was his choice to keep his moneys in treasurer's checks and this way if he decided to buy something like a car he would have the funds to do so.  Special Agent Iantosca further questioned petitioner regarding the funding of the treasurer's checks.  Petitioner replied that he had purchased multiple treasurer's checks with cash in smaller amounts on the same day rather than one big check because he felt like it.  He informed them that they should follow up with Ms. Burlingame at Cape Cod Five because she handled his banking and thus could answer all of their questions.

Special Agent Iantosca followed up with Cape Cod Five and on the basis of what she learned from this followup, the anti-money-laundering compliance check with petitioner shifted to an investigation of Steven.  This investigation spanned 2002 to 2005.  At a time in 2005 not established by the record, Special Agent Iantosca referred this investigation to the U.S. Department of Justice (DOJ), recommending that Steven be prosecuted for filing false Federal income tax returns.

DOJ authorized the prosecution and on April 5, 2006, Steven was indicted by a grand jury of the U.S. District Court for the District of Massachusetts on two

[*15] counts of filing false and fraudulent returns for the years at issue in violation of section 7206(1). The indictment alleged that these returns underreported the gross receipts of Number One Foundations. One year later, on April 5, 2007, the grand jury returned a superseding indictment against petitioner and Steven for one count of conspiracy to "defraud the United States by dishonest and deceitful means by attempting to impede, impair, obstruct and defeat the lawful government functions of the IRS * * * in the ascertainment, computation, assessment, and collection of" income tax in violation of 18 U.S.C. sec. 371 and one count of "corruptly endeavor[ing] to obstruct and impede the due administration of the internal revenue laws" in violation of section 7212(a) for the years at issue. With respect to the latter count, the indictment alleged that petitioner violated section 7212(a) by (1) hiding gross receipts generated by Number One Foundations from his tax return preparer, (2) filing returns for the years at issue that failed to report the actual gross receipts of Number One Foundations, (3) hiding gross receipts of Number One Foundations by failing to deposit such proceeds into Number One Foundations' bank account, (4) structuring the reissuance of certain treasurer's checks so as not to trigger the filing of a CTR, and (5) falsely reporting during the meeting with Special Agents Iantosca and Jay that he or his girlfriend had purchased the treasurer's checks.

[*16] In July 2009 a jury trial was held. In connection with this trial IRS Revenue Agent Joseph Guidoboni (RA Guidoboni) prepared three separate revenue agent's reports.[17] He had been assigned in 2006 to assist with DOJ's prosecution of petitioner and Steven, and he prepared these reports before petitioner and Steven testified at the trial and solely for purposes of computing different scenarios of tax loss. One report attributed all of Number One Foundations' unreported gross receipts[18] to petitioner as income; another report attributed all of Number One Foundations' unreported gross receipts to Steven as income; and the third report split Number One Foundations' unreported gross receipts equally between petitioner and Steven.

Petitioner's testimony, as well as Steven's, during the criminal trial related in pertinent part to how Number One Foundations operated, including the negotiation of customers' checks for treasurer's checks and the use of those

---

[17]A revenue agent's report, consisting usually of at least a Form 4549-A, Income Tax Examination Changes, is also referred to as "an examination report" and commonly called an "RAR". See Laidlaw's Harley Davidson Sales, Inc. v. Commissioner, 154 T.C. ___, ___ (slip op. at 7) (Jan. 16, 2020) (citing Branerton Corp. v. Commissioner, 64 T.C. 191, 194-195 (1975)).

[18]Just as petitioner did in the instant case, he and Steven stipulated in the criminal case that (among other things) Number One Foundations had gross receipts of $1,220,154 and $1,477,905 for 1999 and 2000, respectively. A summary of those gross receipts, i.e., a listing of the 1999 and 2000 customers' checks, was a stipulated exhibit in the criminal case (as well as in the instant case).

[*17] treasurer's checks; to wit, petitioner testified that (1) although he was able to provide Mr. Allen with detailed information for expense deductions he wished to claim, he did not have an effective recordkeeping system for Number One Foundations during the years at issue and (2) in December 1994 a Fleet Bank branch in Hyannis, Massachusetts, and in April 1999 a Compass Bank branch in Sandwich, Massachusetts, had made him fill out CTRs because he received $10,831 and $11,350 in cash, respectively, so he knew as of 1999 that a CTR needed to be filled out if he received more than $10,000 from a bank.

On July 21, 2009, the jury found petitioner not guilty of conspiracy but guilty of corruptly endeavoring to obstruct and impede the tax laws.[19]  He was sentenced to 21 months of imprisonment plus probation.  As part of the terms of his probation he was required to submit complete and accurate amended Federal income tax returns for the years at issue to the IRS.  Petitioner hired Donald Craig, a former IRS revenue agent, to assist in this regard.  In preparing petitioner's amended returns for the years at issue, Mr. Craig reviewed most of the transcripts from the criminal trial, the computations as reflected in the RARs RA Guidoboni prepared in connection with that trial, the stipulated summary of Number One Foundations' gross receipts, and petitioner's original returns for the years at issue

---

[19]Steven was acquitted on both counts.

[*18] and how Mr. Allen prepared them. However, he ultimately prepared petitioner's amended returns for the years at issue using only the customers' checks payable to petitioner and to petitioner and Number One Foundations (as indicated in the stipulated summary of Number One Foundations' gross receipts). Consequently, petitioner's 1999 amended return reported in pertinent part increased Schedule C gross receipts attributable to Number One Foundations of $39,731 (resulting in an additional tax liability of $13,682) and petitioner's 2000 amended return reported in pertinent part increased Schedule C gross receipts attributable to Number One Foundations of $57,231 (resulting in an additional tax liability of $20,259).

In August 2011 petitioner submitted these amended returns, together with payment of the reported additional tax liabilities, to the IRS. The IRS Service Center in Andover, Massachusetts (Andover Service Center), received these returns (along with the payment) but returned them to petitioner because, according to an October 11, 2011, letter that the Andover Service Center sent to him, the "legal period in which to charge and collect additional tax * * * has expired" for the years at issue. Thereafter, the amended returns were sent directly to RA Guidoboni. He reviewed them and then had a discussion about them with his immediate supervisor, IRS Group Manager William T. Noonan. Mr. Noonan

[*19] assigned RA Guidoboni to handle closing out petitioner's case civilly now that the criminal matter had concluded.

## IV.    IRS Administrative Proceedings

RA Guidoboni determined that petitioner's amended returns for the years at issue were inaccurate. Using the specific item method and relying in pertinent part on the stipulations from the criminal trial and petitioner's and Steven's testimony at that trial establishing that petitioner had handled collection and disbursement of Number One Foundations' accounts receivable, he determined that all of Number One Foundations' unreported gross receipts--$333,283 for 1999 and $166,578 for 2000--should be allocated to petitioner.[20] He also determined that section 6663(a) civil fraud penalties should be imposed, and on January 20, 2012, he prepared a Form 11661, Fraud Development Recommendation - Examination, for Mr. Noonan's signature. Mr. Noonan digitally signed the form on March 15, 2012.

The notice of deficiency sent to petitioner on July 2, 2014, reflects those determinations. Petitioner was formally notified, however, of the proposed

---

[20]RA Guidoboni calculated Number One Foundations' unreported gross receipts for the years at issue by taking the difference between Number One Foundations' reportable gross receipts as stipulated in petitioner's criminal case ($1,220,154 for 1999 and $1,477,905 for 2000) and the aggregate gross receipts attributable to Number One Foundations that petitioner and Steven reported on their respective Schedules C for the years at issue ($886,871 for 1999 and $1,311,327 for 2000).

[*20] changes to his Federal income tax, including the imposition of civil fraud penalties, via a so-called 30-day letter, dated January 23, 2012, that the IRS sent to him. The 30-day letter contained in pertinent part the prefatory heading "If you don't agree with the proposed changes", beneath which it explained that petitioner could request a meeting or a telephone conference with Mr. Noonan, and if after that meeting or telephone conference he still did not agree with the proposed changes, he could request a conference with the IRS Office of Appeals (Appeals) by submitting a formal protest. The letter further advised that if petitioner failed to reach an agreement with Appeals or if he did not respond to the letter, a notice of deficiency would be issued to him.

Enclosed with the 30-day letter was (among other documents) an RAR consisting of Form 4549-A and Form 886A, Explanation of Items. The Form 4549-A was signed by RA Guidoboni on January 17, 2012, and the 30-day letter was signed by Mr. Noonan.

Mr. Craig submitted to the IRS on petitioner's behalf a formal protest disagreeing with the proposed changes. On or around May 8, 2014, Appeals sustained in full these changes and Appeals then sent to petitioner the July 2, 2014, notice of deficiency.

**[*21]** OPINION

I. Statutory Period of Limitations To Assess Tax

As a preliminary matter we address petitioner's argument (raised only in passing in his petition and posttrial opening brief) that respondent is barred from assessing the income tax deficiencies for the years at issue because respondent issued the July 2, 2014, notice of deficiency after the statutory period of limitations to assess tax had expired.

Section 6213(a) generally requires the Commissioner to issue a notice of deficiency before assessing a deficiency in Federal income tax against a taxpayer. When a taxpayer has filed a return, section 6501(a) generally requires the Commissioner to assess a deficiency in Federal income tax within three years after the return was filed. Hence, under these general rules, the Commissioner may issue a notice of deficiency to a taxpayer only within the same period.

Respondent does not dispute that the three-year period of limitations had expired before the July 2, 2014, notice of deficiency was sent to petitioner. However, because, as discussed infra, we find that petitioner's underpayments were due to fraud, the Commissioner "is free to determine a deficiency with respect to all items for the particular taxable year without regard to the [three-year] period of limitations." Colestock v. Commissioner, 102 T.C. 380, 385 (1994) (and

[*22] cases cited thereat); see also Kohan v. Commissioner, T.C. Memo. 2019-85, at *2 (quoting section 6501(c)(1)). Accordingly, we hold that the July 2, 2014, notice of deficiency was timely.

## II. Unreported Business Income

Section 61(a) defines "gross income" as "all income from whatever source derived", including "[g]ross income derived from business". Sec. 61(a)(2); sec. 1.61-3(a), Income Tax Regs. A taxpayer is required to maintain books or records sufficient to establish the amount of his or her gross income required to be shown by such person on any return. See sec. 6001; sec. 1.6001-1, Income Tax Regs. It is well settled that if the books or records do not clearly reflect income, the Commissioner is then authorized "to reconstruct income in accordance with a method which clearly reflects the full amount of income received." Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989) (and cases cited thereat). The Commissioner's reconstruction need only be reasonable under all the facts and circumstances. Id.

RA Guidoboni determined that all of Number One Foundations' unreported gross receipts--$333,283 for 1999 and $166,578 for 2000--constituted business income to petitioner. Petitioner contends that respondent erred in attributing

[*23] Number One Foundations' unreported gross receipts to him alone. We find

that the evidence supports respondent.[21]

RA Guidoboni used the specific item method to make these determinations.

The specific item method is a Court-approved "method of income reconstruction

that consists of evidence of specific amounts of income received by the taxpayer

and not reported on the taxpayer's return." Zang v. Commissioner, T.C. Memo.

2017-55, at *17 (citing Estate of Beck v. Commissioner, 56 T.C. 297, 353-354,

361 (1971)); see also Dyer v. Commissioner, T.C. Memo. 2012-224, at *17 (and

cases cited threat) (noting that the Court has approved the specific item method

for recomputing taxable income). Petitioner contends that (1) he did not receive

checks in the amounts reflected in the July 2, 2014, notice of deficiency, (2) he did

not exercise dominion and control over customers' checks made payable to Steven

or Number One Foundations, and (3) the customers' checks made payable to

Steven or Number One Foundations are not income to him. We disagree.

---

[21]Before trial petitioner filed a motion to shift the burden of proof with respect to Number One Foundations' gross receipts on the ground that the July 2, 2014, notice of deficiency was "erroneous, excessive, arbitrary or capricious". We are persuaded that the gross receipts in question must be included in petitioner's income for the years at issue regardless of which party bears the burden of proof. Accordingly, we will deny petitioner's motion to shift the burden of proof. Petitioner does not otherwise contend that the burden of proof should shift to respondent under sec. 7491(a), nor has he established that the requirements for shifting the burden of proof under sec. 7491(a) have been met.

[*24] The record shows, and we have found, that petitioner founded Number One Foundations and that since its founding and through at least the years at issue Number One Foundations was petitioner's unincorporated business that he (not Steven) actively controlled and principally managed. To that end, petitioner (not Steven) received customers' checks at his Centerville, Massachusetts, home. He met with Steven weekly and gave him detailed instructions regarding what to do with those checks; he told Steven to cash some and bring the cash back to him, to negotiate some for treasurer's checks (including whether to make the treasurer's checks payable to him or Steven), and to deposit portions of some and receive the remainder in cash and/or treasurer's checks.[22] Moreover, Steven did not retain the profits from Number One Foundations in a manner consistent with that of a business owner; in addition to petitioner's directions on what to do with customers' checks, Steven received a weekly salary of $600-$800 from Number One Foundations. Thus it is inconsequential that Steven controlled Number One Foundations' business bank accounts at Cape Cod Five (having sole signature

---

[22]Indeed, the sec. 61(a) gross income definition is to be construed broadly and has "been held to encompass all 'accessions to wealth, clearly realized, and over which the taxpayer[] * * * [has] complete dominion.'" James v. United States, 366 U.S. 213, 219 (1961) (quoting Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955)).

[*25] authority over those accounts) as that control in turn was always under petitioner's control.

Accordingly, we sustain respondent's determination that Number One Foundations' unreported gross receipts of $333,282 and $166,578 for 1999 and 2000, respectively, constituted business income to petitioner.

III. Civil Fraud Penalties

Section 6663(a) provides that "[i]f any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." The section 6663(a) fraud penalty is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Purvis v. Commissioner, T.C. Memo. 2020-13, at *26 (citing Helvering v. Mitchell, 303 U.S. 391, 401 (1938), and Sadler v. Commissioner, 113 T.C. 99, 102 (1999)).

The Commissioner has the burden of proving fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b). To do so, the Commissioner must prove for each relevant year that (1) an underpayment of tax exists and (2) the underpayment was due to fraud. See Sadler v. Commissioner, 113 T.C. at 102;

[*26] Katz v. Commissioner, 90 T.C. 1130, 1143 (1988). When the allegations of fraud are intertwined with reconstructed unreported income, as they are here, the Commissioner can satisfy the former burden by either proving a likely source of the unreported income or (where the taxpayer alleges a nontaxable source) disproving the nontaxable source so alleged. Parks v. Commissioner, 94 T.C. 654, 661 (1990). The Commissioner can satisfy the latter burden if he shows that the taxpayer intended to conceal, mislead, or otherwise evade the collection of taxes known or believed to be owing. Katz v. Commissioner, 90 T.C. at 1143 (and cases cited thereat). If the Commissioner establishes that any portion of the underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud and subject to a 75% penalty unless the taxpayer establishes by a preponderance of the evidence that some part of the underpayment is not attributable to fraud. Sec. 6663(b).

The Commissioner bears the burden of production with respect to an individual taxpayer's liability for any penalty. Sec. 7491(c). In Frost v. Commissioner, 154 T.C. ___, ___ (slip op. at 20) (Jan. 7, 2020), we recently held that the Commissioner's initial burden of production under section 7491(c) includes producing evidence that he has complied with the procedural requirements of section 6751(b) and that once he has satisfied this initial burden

[*27] the taxpayer must come forward with contrary evidence. We address the burden of production issue first.

A.    Section 6751(b) Compliance

Section 6751(b)(1) requires the initial determination of certain penalties be "personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." See Graev v. Commissioner, 149 T.C. 485, 492-493 (2017), supplementing and overruling in part 147 T.C. 460 (2016); see also Clay v. Commissioner, 152 T.C. 223, 248 (2019) (quoting section 6751(b)(1)). In Belair Woods, LLC v. Commissioner, 154 T.C. ___, ___ (slip op. at 24-25) (Jan. 6, 2020), we recently held that "the 'initial determination' of a penalty assessment * * * is embodied in the document by which the Examination Division formally notifies the taxpayer, in writing, that it has completed its work and made an unequivocal decision to assert penalties."

Consistent with our holding in Clay, the January 23, 2012, 30-day letter with RA Guidoboni's RAR embodied the initial determination--i.e., the first formal communication of the conclusion--that assertion of the section 6663 civil penalties against petitioner for the years at issue was warranted. Mr. Noonan, RA Guidoboni's immediate supervisor, approved RA Guidoboni's RAR by signing the

**[*28]** 30-day letter on January 23, 2012, and then the letter was sent to petitioner later that same day. We hold that respondent has introduced evidence that written supervisory approval of section 6663 civil fraud penalties was given before a formal communication of those penalties to petitioner and that the evidence is sufficient to show that he complied with the procedural requirements of section 6751(b). See Flume v. Commissioner, T.C. Memo. 2020-80, at *34.

The burden now shifts to petitioner to offer evidence that written supervisory approval of the penalties was untimely. See Frost v. Commissioner, 154 T.C. at ___ (slip op. at 22). Petitioner contends that supervisory approval of the section 6663 civil fraud penalties was not manifested by the 30-day letter because respondent failed to authenticate that Mr. Noonan signed the 30-day letter or when he purportedly did so. According to petitioner, written supervisory approval of the penalties was manifested by Mr. Noonan's digital signature on the Form 11661 on March 15, 2012, 51 days after the date of the 30-day letter and therefore the requisite approval was untimely. Petitioner's contention, however, is without merit.

As reflected in the stipulation of facts, the parties agreed that

all exhibits referred to herein and attached hereto may be accepted as authentic and are incorporated in this stipulation and made a part hereof; provided, however, that either party has the right to object to

[*29] the admission of any such facts and exhibits in evidence on the grounds of relevancy and materiality, but not on other grounds unless expressly reserved herein, and provided, further, that either party may introduce other and further evidence not inconsistent with the facts herein stipulated.

The 30-day letter (with RA Guidoboni's RAR) was a stipulated exhibit that neither petitioner nor respondent reserved an objection to. Thus, its authenticity--Mr. Noonan's signature and the date reflected therein--is incontrovertible, and the Form 11661 is of no moment. Accordingly, we hold that the penalties here were approved in writing before the first formal communication to petitioner of those penalties. See id. at ___ (slip op. at 23) (citing Clay v. Commissioner, 152 T.C. at 249).

B.    Section 6663(a) Analysis

We now address whether petitioner is liable for section 6663(a) fraud penalties for the years at issue.

Petitioner's submission of amended returns for the years at issue reporting increased Schedule C gross receipts attributable to Number One Foundations (and resulting in additional tax liabilities) confirms that he does not dispute that he underreported his business income for those years (resulting in underpayments for both years); his dispute centers on the extent of the amounts unreported. Indeed, respondent is not required to establish the precise amount of the deficiency to

**[\*30]** prove an underpayment. See DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). Additionally, as discussed supra pp. 22-25, petitioner underreported his business income attributable to Number One Foundations by $333,283 and $166,578 for 1999 and 2000, respectively. Accordingly, respondent has proven by clear and convincing evidence that petitioner underpaid his tax liabilities for the years at issue.

Next, we must determine whether respondent has proven by clear and convincing evidence that any portions of the underpayments are attributable to fraud. As indicated supra p. 26, fraud for this purpose is defined as intentional wrongdoing by the taxpayer motivated by a specific purpose of avoiding tax believed to be owing. Maciel v. Commissioner, 489 F.3d 1018, 1026 (9th Cir. 2007), aff'g in part, rev'g in part T.C. Memo. 2004-28; Neely v. Commissioner, 116 T.C. 79, 86 (2001). Fraud "does not include negligence, carelessness, misunderstanding or unintentional understatement of income" but does include any conduct designed to conceal, mislead, or otherwise prevent the collection of taxes. United States v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956); see Holland v. United States, 348 U.S. 121, 139 (1954); United States v. Murdock, 290 U.S. 389, 396 (1933); DiLeo v. Commissioner, 96 T.C. at 874.

[*31] The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  See DiLeo v. Commissioner, 96 T.C. at 874. Fraud will never be presumed and must be established by independent evidence of fraudulent intent.  Recklitis v. Commissioner, 91 T.C. 874, 909-910 (1988). However, because direct proof of a taxpayer's fraudulent intent is rarely available, fraud may be established by circumstantial evidence and inferences drawn from the facts.  Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992).

Fraudulent intent may be inferred from various kinds of circumstantial evidence or "badges of fraud".  Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601.  To this end, courts have routinely considered whether the following badges of fraud are present:  (1) a pattern of understating income, (2) failing to maintain adequate records, (3) offering implausible or inconsistent explanations of behavior, (4) concealing income or assets, (5) dealing in cash, (6) providing incomplete or misleading information to his or her tax return preparer, (7) filing false documents, including filing false Federal income tax returns, (8) failing to file Federal income tax returns, (9) failing to cooperate with tax authorities, and (10) engaging in and attempting to conceal illegal activity.  See id.; Niedringhaus v. Commissioner, 99 T.C. at 211. The existence of any one factor is not dispositive but the existence of several

[*32] factors is persuasive circumstantial evidence of fraud. See Niedringhaus v. Commissioner, 99 T.C. at 211; Petzoldt v. Commissioner, 92 T.C. at 700.

Numerous badges of fraud are present here. Petitioner consistently and purposefully had Steven negotiate customers' checks for treasurer's checks in amounts less than $10,000. He personally negotiated customers' checks for treasurer's checks in this way as well. Additionally, when 21 treasurer's checks from 1998 needed to be reissued, Ms. Burlingame (the assistant branch manager of Cape Cod Five's Centerville, Massachusetts, location) asked petitioner whether he would like her to issue one or two treasurer's checks or open an interest-bearing money market account or certificate of deposit; but he declined her suggestions. He failed to present any plausible or believable reason for why he negotiated customers' checks for treasurer's checks the way he did. On the basis of the record before us, we find that during the years at issue petitioner was aware of CTRs and knowingly negotiated (or had Steven negotiate) customers' checks for treasurer's checks in amounts less than $10,000 to ensure that no CTRs would need to be prepared and thereby to conceal income; this evidence is a strong indicator of fraud for the years at issue. See Spies v. United States, 317 U.S 492, 499 (1943) (holding that fraudulent intent may be inferred when a taxpayer handles his affairs in a manner designed "to avoid making the records usual in

[*33] transactions of the kind"); see also Walters v. Commissioner, T.C. Memo. 1995-543, slip op. at 25 (finding that keeping large sums of money in non-interest-bearing instruments for a long period allowed the taxpayer to render the money "virtually undetectable by anyone concerned").

Petitioner dealt extensively in cash. Customers' checks would be cashed and then some of that cash would be used to pay wages "under the table" to Number One Foundations' undocumented laborers (and consequently, no Federal employment taxes were withheld and paid on these wages). See Bradford v. Commissioner, 796 F.2d at 307-308; Valbrun v. Commissioner, T.C. Memo. 2004-242, slip op. at 9.

Petitioner does not dispute that he did not maintain adequate books and records for Number One Foundations during the years at issue; and as a result RA Guidoboni resorted to the specific item method to determine petitioner's business income attributable to Number One Foundations. See Truesdell v. Commissioner, 89 T.C. 1280, 1302-1303 (1987).

Petitioner hired Mr. Allen to prepare his Federal income tax returns for the years at issue. The record shows, and we have found, that petitioner failed to disclose the full extent of his business income attributable to Number One Foundations for the years at issue; he provided Mr. Allen with handwritten ledger

[*34] sheets or a worksheet that listed in pertinent part only conclusory income totals and did not provide him with any supporting documentation, such as Forms 1099, receipts, invoices, or bank statements. Petitioner thus provided Mr. Allen with incomplete and misleading information. See Purvis v. Commissioner, at *42-*43 (and cases cited threat) (holding that a taxpayer's failure to provide his tax return preparer complete and accurate records may reflect a taxpayer's intent to conceal and deceive).

Petitioner was found guilty of "corruptly endeavor[ing] to obstruct and impede the due administration of the internal revenue laws" in violation of section 7212(a) for the years at issue. See Duncan & Assocs. v. Commissioner, T.C. Memo. 2003-158, slip op. at 16-17 (finding that the taxpayer's guilty plea to one count of violating section 7212(a) was indicative of fraud).

Respondent has proven by clear and convincing evidence that for each year at issue petitioner had an underpayment of tax due to fraudulent intent.

Petitioner contends that he never intended to evade his tax for the years at issue and that his underreporting was not attributable to any fraudulent acts he committed but to the negligence of Mr. Allen. As we have already found, see supra pp. 32-34, petitioner's actions with respect to Number One Foundations were indeed purposeful (and resulted in his being found guilty on one count of

**[\*35]** violating section 7212(a)), and he failed to provide Mr. Allen with complete and accurate information regarding Number One Foundations' operations, in particular and as relevant here, its gross receipts for the years at issue. Thus, his contention lacks merit, and he has not proven that any specific portion of any underpayment was not attributable to fraud. <u>See</u> sec. 6663(b).

We sustain respondent's determination that petitioner is liable for the section 6663(a) civil fraud penalties for the years at issue.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued,</u> <u>and decision will be entered under Rule</u> <u>155</u>.